IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

MICHAEL JAMES GRIFFIN,      §
                            §
          Plaintiff,        §
                            §
v.                          §        CIVIL ACTION NO. H-07-4030
                            §
MICHAEL J. ASTRUE,          §
COMMISSIONER OF THE         §
SOCIAL SECURITY             §
ADMINISTRATION,             §
                            §
          Defendant.        §

**<u>MEMORANDUM OPINION</u>**

Pending before the court[1] are Defendant's Motion for Summary
Judgment (Docket Entry No. 15) and Plaintiff's Motion for Summary
Judgment (Docket Entry No. 14). The court has considered the
motions, all relevant filings, and the applicable law. For the
reasons set forth below, the court **REMANDS** this action to the
Secretary for further consideration and development of the record.

## I.  Case Background

Plaintiff filed this action pursuant to 42 U.S.C. §§ 405(g)
and 1383(c)(3) for judicial review of an unfavorable decision by
the Commissioner of the Social Security Administration
("Commissioner") regarding Plaintiff's claim for supplemental
income benefits under Title XVI of the Social Security Act ("the
Act").

---

[1]      The parties consented to proceed before the undersigned magistrate
judge for all proceedings, including trial and final judgment, pursuant to 28
U.S.C. § 636(c) and Federal Rule of Civil Procedure 73.  Docket Entry Nos. 9,
13.

Plaintiff was born on February 28, 1965, and was thirty-five years old on the date of the alleged onset of disability.[2] Plaintiff completed eleventh grade before dropping out of high school.[3] Prior to the alleged onset of his disability, Plaintiff never worked a full-time job for any extended period of time.[4] Plaintiff was instead employed as a general maintenance worker by his father's carpet company.  He worked once or twice a week over a period of twenty years.[5]

Plaintiff filed for disability benefits on April 13, 2005, claiming disability and an inability to work since December 1, 2000, due to lower back pain and shortness of breath.[6]  On May 27, 2005, Plaintiff's claim was initially denied.[7]  However, three days after the initial denial, on May 30, 2005, Plaintiff was struck by a car while riding a bicycle and sustained significant head injuries.[8]  Plaintiff was treated at Ben Taub Hospital with a left craniotomy and evacuation of subdural hematoma.[9]  While in the hospital, Plaintiff participated in speech and occupational

---

[2]   Transcript of the Administrative Proceedings ("Tr.") 16, 312.

[3]   Tr. 313.

[4]   Tr. 316-17, 319.

[5]   Tr. 316, 318-19.

[6]   Tr. 24.

[7]   Tr. 16.

[8]   Tr. 241.

[9]   Id.

therapy.[10]    He   was   released   from   the   hospital   with   the
recommendation that he participate in further rehabilitation.[11]  By
November   2005,   Plaintiff   had   not   completed   the   recommended
occupational therapy.[12]   Records from the Harris County Hospital
District dated on December 12, 2005, show that Plaintiff continued
to suffer right shoulder pain and memory problems stemming from the
accident.[13]

A neuropsychological evaluation was administered to Plaintiff
by Larry Pollock, Ph.D, ("Dr. Pollock") on April 3, 2006.[14]   Dr.
Pollock determined that Plaintiff had severe cognitive impairments
and required "cognitive rehabilitation in order to successfully
maintain employment."[15]

A Weschler Adult Intelligence Test - Third Edition ("WAIS-III")
found Plaintiff mildly mentally retarded with scores of Full Scale
Intelligence Quotient ("IQ") of 68, a Verbal IQ of 74, and a
Performance IQ of 67.[16]   Plaintiff was found to be moderately to
severely deficient in academic functioning based on his scores on

---

[10]     Tr. 233.

[11]     Id.

[12]     Tr. 267.

[13]     Tr. 259.

[14]     Tr. 293-309.

[15]     Tr. 301.

[16]     Tr. 298.

the Wide Range Achievement Test - Revised ("WRAT-R").[17]  In other testing, Plaintiff was found to be severely deficient in the following categories:  immediate recall of rote verbal learning, logical verbal memory after thirty minutes, reproduction of a complex geometric design from memory, and visual recognition memory.[18]  Plaintiff had moderate deficiencies in immediate recall of short prose passages, copying a complex geometric design, alertness to visual details, visual-motor speed and certain executive functions.  Plaintiff also had a Global Assessment of Functioning ("GAF") score of 56, indicating a moderate cognitive deficiency.[19]

During the evaluation, Plaintiff reported that he had smoked crack cocaine for one year in the past, but had been sober for two years.[20]  Dr. Pollock observed that Plaintiff had clear behavior,

---

[17]    Tr. 297.

[18]    Tr. 298.

[19]    Tr. 302.  The Court adopts Defendant's explanation of the GAF score as explained in their Motion for Summary Judgment:

The GAF is a numerical score from 0 to 100 that considers the 'psychological, social and occupational functioning on a hypothetical continuum of mental health-illness.'Diagnostic and Statistical Manual of Mental Disorders IV-TR, p. 34 (4th ed. 2000). A GAF score of 51-60 represents someone with 'moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).' Id.

[20]    Id.

speech, and thought processes.[21]  Plaintiff also reported that he was able to use the public bus system without trouble.[22]

Interpreting these findings, Dr. Pollock reported that Plaintiff's severe impairments in verbal learning made it difficult for him to learn verbal information.[23]  Dr. Pollock found that Plaintiff's severe impairment in visual memory made it difficult for him to plan and organize visual information.[24]  Finally, he found that Plaintiff's severe impairments in executive functioning would make it difficult for Plaintiff to function in an unstructured situation, problem-solve, organize and make judgments.[25]  Dr. Pollock recommended cognitive rehabilitation.[26]

Plaintiff received medical testing prior to his hearing with the ALJ.  A magnetic resonance imaging scan ("MRI") on June 14, 2006, showed a partial tear and degenerative changes in his right shoulder joint and associated tendons.[27]

In January 2007, Plaintiff was examined by Ellen M. Levin, Ph.D, ("Dr. Levin") at The Institute for Rehabilitation & Research

---

[21]     Tr. 306.

[22]     Id.

[23]     Tr. 300.

[24]     Id.

[25]     Id.

[26]     Id.

[27]     Tr. 282.

("TIRR").[28]   TIRR records showed that Plaintiff complained of a
reduced range of motion in his right arm, memory problems, and
headaches.[29]  Plaintiff reported taking only ibuprofen for shoulder
pain.[30]  Dr. Levin found Plaintiff to be mildly depressed.[31]   In an
e-mail to a Texas Department of Assistive and Rehabilitative
Services, Dr. Levin opined that Plaintiff had severe residual
cognitive impairments making it "unlikely" that he could obtain or
sustain competitive employment.[32]   Dr. Levin also noted that pain
associated with Plaintiff's shoulder difficulties made it unlikely
that he could perform a physically-demanding job.[33]  She recommended
that Plaintiff participate in rehabilitation services such as memory
compensation strategies with the goal of becoming more independent.
Alternatively, Dr. Levin believed Plaintiff might be able to work
in a sheltered environment if those services were supported through
the State's rehabilitative programs.[34]

At the ALJ hearing on February 7, 2007, Plaintiff, his mother
and a vocational expert ("VE") testified.[35]  Plaintiff stated that

---

[28]    Tr. 285-292.

[29]    Id.

[30]    Tr. 288.

[31]    Tr. 288.

[32]    Tr. 285.

[33]    Id.

[34]    Id.

[35]    Tr. 310.

he had laid carpet for his father for years.[36]  He testified that he could not work more than ten minutes before forgetting instructions.[37]  He stated that his memory problems began in 2005 after his bicycle accident.[38]  Plaintiff also reported that he had pain in his ankles and could not raise his right (dominant) hand above his shoulder.[39]  Plaintiff stated that he could stand for thirty minutes, sit for an hour, walk two blocks and lift fifty pounds.[40] He thought he could lift ten pounds regularly.[41]  In terms of his daily activities, Plaintiff testified that he lived with his mother, but did not do much around the house except a few exercises for his arm.[42] He spent most of his day watching television and looking at pictures in books while reading the stories as best as he could.[43]  Plaintiff reported being able to bathe, shower and cook.[44]   He also stated that his mother administered his medications, which made him drowsy and lethargic.[45]

---

[36]    Tr. 318.

[37]    Tr. 317.

[38]    Tr. 320.

[39]    Id.

[40]    Tr. 321-23.

[41]    Tr. 331.

[42]    Tr. 322.

[43]    Tr. 322, 327.

[44]    Tr. 306.

[45]    Tr. 329-30.

Plaintiff's mother testified that Plaintiff's biggest problem was his memory and that she did not trust Plaintiff to cook, wash or drive because of his memory problems.[46]   She stated that Plaintiff occasionally got lost when he left the house.[47]   She routinely administered his medication because he would forget to take it otherwise.[48]   However, Plaintiff's mother also testified that Plaintiff had "quite a bit" of energy around the house and drank approximately one beer a day.[49]

The VE testified that Plaintiff had no previous relevant work but was able to perform light, unskilled work.[50]   Based on her evaluation of Plaintiff's age, education, work experience and residual functional capacity, the VE testified that Plaintiff could perform the requirements of light unskilled work such as parking lot attendant, cashier, and ticket taker.[51]   When asked by Plaintiff's attorney whether Plaintiff's ability to perform work might be hindered by certain medications, the VE acknowledged that it was possible but she had not seen that effect in her experience.[52]   The

---

[46]   Tr. 333-34.

[47]   Tr. 334.

[48]   Tr. 335.

[49]   Id.

[50]   Tr. 337.

[51]   Tr. 338.

[52]   Tr. 342.

8

VE also stated that Plaintiff's tested reading levels were adequate for the jobs she indicated.[53]

The hearing ended with a request from Plaintiff's attorney that the ALJ ask Dr. Pollock to complete a mental assessment of Plaintiff's ability to do work-related activities from a mental standpoint based on his report.[54]  At that time, the ALJ stated that "I won't make a commitment . . . I will commit that I will evaluate your request".[55]

On March 27, 2007, the ALJ issued his decision finding that Plaintiff was not disabled for any period since the alleged onset date of disability.[56]  He found that Plaintiff had not engaged in substantial gainful activity and that Plaintiff's lower back pain, status post-right-shoulder injury and memory problems were severe.[57]  However, the ALJ determined that based on symptoms evidenced in medical records, types of medication, and testimony at the hearing, Plaintiff's impairments, either singly or in combination, did not meet or equal any of the Listings.[58]

---

[53]     Tr. 341.

[54]     Tr. 343.

[55]     Id.

[56]     Tr. 23.

[57]     Tr. 18.

[58]     Tr. 19-20. "The Listings" refers to impairments listed in Appendix 1 of the SSA regulations. 20 C.F.R. Pt. 404, Subpt. P, App. 1.

According to the ALJ, Plaintiff retained a residual functional capacity ("RFC") to perform light work.[59]   The ALJ stated that Plaintiff could stand or walk for three to four of eight hours in a work day.[60]  He could sit six to eight hours in a work day.[61]  He could carry twenty pounds occasionally and ten pounds frequently.[62] He could occasionally climb ropes, ladders, and scaffolds.[63] Mentally, Plaintiff could understand, remember and carry out simple instructions and could make only simple work-related decisions.[64] He was also able to respond appropriately to supervisors and co-workers in usual work settings.[65]  Crediting the testimony of the VE, the ALJ concluded that Plaintiff could perform relevant work in the regional and national economies such as parking lot attendant, cashier, or ticket taker.[66]

In reaching his decision, the ALJ rejected the treating physicians' opinions and Plaintiff's own testimony concerning his mental limitations.[67]  The ALJ also gave little weight to a doctor's

---

[59]     Tr. 20.

[60]     Id.

[61]     Id.

[62]     Id.

[63]     Id.

[64]     Id.

[65]     Id.

[66]     Id.

[67]     Tr. 21-22.

opinion concerning employment limitations caused by cirrhosis of the liver.[68]  In support of his opinion, the ALJ cited to Plaintiff's testimony that he had no effects from liver problems and his mother's testimony that he had a lot of energy.[69]  In addition, the ALJ considered Dr. Levin's opinion that Plaintiff was unable to sustain competitive work, but gave that opinion little weight without explanation.[70]  Likewise, he considered the opinion of Dr. Pollock, but assigned it little weight, again, without explanation.[71]

The ALJ also found that Plaintiff's testimony concerning the intensity, persistence and limiting effects of his symptoms was not entirely credible.[72]  According to the ALJ, Plaintiff's lack of a work history prior to his injury in 2005 and his admissions that he served time, previously used crack cocaine, and had a history of alcoholism all negatively impacted his credibility.[73]  The ALJ concluded that Plaintiff could perform at least simple work on a sustained basis.[74]

---

[68]     Tr. 22.

[69]     Id.

[70]     Id.

[71]     Id.

[72]     Tr. 21.

[73]     Id.

[74]     Tr. 22.

Plaintiff appealed the ALJ's decision on May 14, 2007.[75]  On September 26, 2007, the Appeals Council denied Plaintiff's request for review, finding no reason to review the ALJ's decision under its rules.[76]  Plaintiff filed a complaint with this court on November 28, 2007, seeking judicial review.

Also, in November 2007, Plaintiff filed a new application for supplemental security income benefits based on a letter written by Jill C. Vutpakdi, Ph.D., ("Dr. Vutpakdi") and was approved.[77] Accordingly, the court considers Plaintiff's appeal for a closed period of disability, May 30, 2006, through the award of benefits in November 2007.

## II.  Standard of Review and Applicable Law

The court's review of a final decision by the Commissioner denying disability benefits is limited to the determination of whether: 1) substantial evidence in the record supports the decision; and 2) the ALJ applied proper legal standards in evaluating the evidence. Waters v. Barnhart, 276 F.3d 716, 718 (5th Cir. 2002); Brown v. Apfel, 192 F.3d 492, 496 (5th Cir. 1999).

## A.  Substantial Evidence

The widely accepted definition of "substantial evidence" is "that quantum of relevant evidence that a reasonable mind might

---

[75]     Tr. 6-10.

[76]     Tr. 3-5.

[77]     See Plaintiff's Response to Defendant's Motion for Summary Judgment, Docket Entry No. 16, p. 6.

accept as adequate to support a conclusion," <u>Carey v. Apfel</u>, 230
F.3d 131, 135 (5th Cir. 2000).  It is "something more than a
scintilla but less than a preponderance." <u>Id.</u>  The Commissioner has
the responsibility of deciding any conflict in the evidence.  <u>Id.</u>
If the findings of fact contained in the Commissioner's decision are
supported by substantial record evidence, they are conclusive, and
this court must affirm. 42 U.S.C. § 405(g); <u>Selders v. Sullivan</u>, 914
F.2d 614, 617 (5th Cir. 1990).

Only if no credible evidentiary choices of medical findings
exist to support the Commissioner's decision should the court
overturn it. <u>Johnson v. Bowen</u>, 864 F.2d 340, 343-44 (5th Cir. 1988).
In applying this standard, the court is to review the entire record,
but the court may not reweigh the evidence, decide the issues de
novo, or substitute the court's judgment for the Commissioner's
judgment. <u>Brown</u>, 192 F.3d at 496.  In other words, the court is to
defer to the decision of the Commissioner as much as is possible
without making its review meaningless. <u>Id.</u>

**B.   <u>Legal Standard</u>**

In order to obtain disability benefits, a claimant bears the
ultimate burden of proving he is disabled within the meaning of the
Act.  <u>Wren v. Sullivan</u>, 925 F.2d 123, 125 (5th Cir. 1991).  Under
the applicable legal standard, a claimant is disabled if he is
unable "to engage in any substantial gainful activity by reason of
any medically determinable physical or mental impairment . . . which

13

has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a); <u>see also Greenspan v. Shalala</u>, 38 F.3d 232, 236 (5th Cir. 1994). The existence of such a disabling impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic" findings. 42 U.S.C. §§ 423(d)(3), (d)(5)(A); <u>Anthony v. Sullivan</u>, 954 F.2d 289, 296 (5th Cir. 1992).

To determine whether a claimant is capable of performing any "substantial gainful activity," the regulations provide that disability claims should be evaluated according to the following sequential five-step process:

> (1) a claimant who is working, engaging in a substantial gainful activity, will not be found to be disabled no matter what the medical findings are; (2) a claimant will not be found to be disabled unless he has a "severe impairment;" (3) a claimant whose impairments meets or is equivalent to an impairment listed in [the Listings] will be considered disabled without the need to consider vocational factors; (4) a claimant who is capable of performing work that he has done in the past must be found "not disabled;" and (5) if the claimant is unable to perform his previous work as a result of his impairment, then factors such as his age, education, past work experience, and [RFC] must be considered to determine whether he can do other work.

<u>Bowling v. Shalala</u>, 36 F.3d 431, 435 (5th Cir. 1994); see also 20 C.F.R. § 416.920. By judicial practice, the claimant bears the burden of proof on the first four of the above steps, while the Commissioner bears it on the fifth. <u>Crowley v. Apfel</u>, 197 F.3d 194, 198 (5th Cir. 1999); <u>Brown</u>, 192 F.3d at 498. The Commissioner can satisfy his burden by reliance upon the Medical Vocational

Guidelines of the Regulations or by expert vocational testimony or other similar evidence. Fraga v. Bowen, 810 F.2d 1296, 1304 (5th Cir. 1987). If the Commissioner satisfies his step-five burden of proof, the burden shifts back to the claimant to prove he cannot perform the work suggested. Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991). The analysis stops at any point in the process upon a finding that the claimant is disabled or not disabled. Greenspan, 38 F.3d at 236.

### III.  Analysis

Plaintiff requests judicial review of the ALJ's decision to deny disability benefits.  Specifically, Plaintiff argues that the ALJ's failure to obtain medical expert opinion to either refute or corroborate the medical evaluations and opinions provided by Plaintiff's treating physicians constitutes legal error.  Plaintiff also asserts that the ALJ's finding that Plaintiff retained the mental ability to understand, to remember and carry out simple instructions, to make simple work related decisions, and to respond appropriately to supervisors and co-workers in usual work settings is not supported by substantial evidence in the record.  On the other hand, Defendant argues that the ALJ's decision is legally and factually correct.

### A.  The ALJ Improperly Discounted the Examining Physicians' Opinions

In the present case, two examining physicians, Drs. Pollock and Levin, found that Plaintiff was "severely deficient" in several

15

categories of intellectual functioning, and, based on those deficiencies, both opined that Plaintiff was not capable of gainful employment. Plaintiff argues that the ALJ improperly ignored these findings without first obtaining medical expert testimony to support his conclusion that Plaintiff's limitations were not disabling. The court agrees.

According to the Fifth Circuit, "a treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is 'well supported by medically acceptable clinical laboratory diagnostic techniques and is not inconsistent with . . . other substantial evidence.'" Newton v. Apfel, 209 F.3d 448, 455 (5th Cir. 2000); Martinez v. Chater, 64 F.3d 172, 175 (5th Cir. 1995).

On the other hand, an ALJ may discount the opinion of a physician in very limited circumstances upon a showing of good cause. "Good cause may permit an ALJ to discount the weight of a treating physician relative to other experts where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." Newton, 209 F.3d at 456.

Good cause may also exist when the treating physician offers a non-medical opinion. Frank v. Barnhart, 326 F.3d 618 (5th Cir. 2003); 20 C.F.R. § 416.927(e)(1). In Frank, the court held that the ALJ was not required to specifically consider the six factors set

out in <u>Newton</u> before giving little weight to the doctor's opinion
that Frank was unable to work.  <u>Frank</u>, 326 F.3d at 620.  There, the
court stated that "among the opinions by treating doctors that have
no special significance are determinations that an applicant is
'disabled' or 'unable to work.'" <u>Id.</u>

In the present case, however, the ALJ did not simply discount
conclusions of a treating physician that Plaintiff was disabled or
choose between conflicting medical expert opinions.  Rather, the ALJ
ignored two physicians' consistent interpretations of the results
of standardized intellectual testing and substituted his own
opinion.  The Fifth Circuit warned against this "playing doctor"
conduct in <u>Frank</u>:

> But judges, including [ALJs] of the Social Security
> Administration, must be careful not to succumb to the
> temptation to play doctor . . . .  The medical expertise
> of the Social Security Administration is reflected in
> regulations; it is not the birthright of the lawyers who
> apply them.  Common sense can mislead; lay intuitions
> about medical phenomena are often wrong.

<u>Frank</u>, 326 F.3d at 622(quoting <u>Schmidt v. Sullivan</u>, 914 F.2d 117,
118 (7th Cir. 1990)).  The ALJ was not free to disregard the test
results and opinions of Drs. Pollock and Levin concerning
Plaintiff's severe short-term memory loss and other severe adaptive
deficits without some testimony or evidence in the record that
supported his conclusions.  <u>See</u> <u>Newton</u>, 209 F.3d at 455-56.

The ALJ has a duty to develop the facts fully and fairly
relating to an applicant's claim for disability benefits.  <u>Carey</u>,

230 F.3d at 142; <u>Kane v. Heckler</u>, 731 F.2d 1216, 1219 (5th Cir. 1984).  The ALJ is required to request a medical source statement describing the types of work that the applicant was still capable of performing.  <u>See</u> 20 C.F.R. 404.1513(b)(6)(medical reports should include "[a] statement about what you can still do despite your impairment(s) based upon the medical source's findings").  When a mental impairment is involved, the ALJ must consider "the acceptable medical source's opinion about [a claimant's] ability to understand, to carry out and remember instructions, and to respond appropriately to supervision, coworkers, and work pressures in a work setting.  20 C.F.R. § 404.1513(c)(2).

Reversal of the ALJ's decision for failure to develop the record, however, is appropriate only if the applicant shows that he was prejudiced.  <u>Kane</u>, 731 F.2d at 1220.  Prejudice can be established by showing that additional evidence would have been produced if the ALJ had fully developed the record, and that the additional evidence might have led to a different decision.  <u>Id.</u>

For new evidence to be considered material, there must exist the "reasonable possibility that it would have changed the outcome of the [Commissioner's] determination" had it been before him.  <u>Latham v. Shalala</u>, 36 F.3d 482, 483 (5th Cir. 1994)(quoting <u>Chaney v. Schweiker</u>, 659 F.2d 676, 679 (5th Cir. 1981)).  Implied in the materiality requirement "is that the new evidence relate to the time period for which benefits were denied, and that it not concern

evidence of a later-acquired disability or of the subsequent deterioration of the previously non-disabling condition." Johnson v. Heckler, 767 F.2d 180, 183 (5th Cir. 1985) (quoting Szubak v. Sec'y of Health & Human Servs., 745 F.2d 831, 833 (3d Cir. 1984)).

In the present case, Plaintiff has shown that he was prejudiced by the ALJ's failure to obtain additional medical testimony. In support of the prejudice requirement, Plaintiff attached a subsequent mental assessment medical opinion by Dr. Vutpakdi that provides more information in layman's terms concerning Plaintiff's limitations.[78] Dr. Vutpakdi worked under the supervision of Dr. Pollock and her opinion was based on his 2006 testing as well as a shorter neuropsychological battery of tests that she administered.[79] Significant to the materiality of the new evidence, Dr. Vutpakdi found Plaintiff's performance on cognitive testing "essentially unchanged" from earlier testing and characterized his learning and memory difficulties as "profound."[80]

Dr. Vutpakdi agreed with Dr. Pollock's earlier opinion that Plaintiff's documented severe memory impairments made competitive employment an unrealistic option, giving as examples incidents where Plaintiff (1) asked her the same question four times in the span of an hour with no recollection that he had asked the question before,

---

[78]    Plaintiff's Motion for Summary Judgment (Docket Entry No. 14), Ex. A, November 16, 2007, letter from Dr. Vutpakdi.

[79]    Id.

[80]    Id. at p. 2.

(2) estimated he had attended rehabilitation training for one week when he had been attending for three weeks, (3) when interrupted from a task, could not remember what the task was unless there was clear evidence of the task in front of him, and (4) reacted emotionally each time he was told that he would likely need to reapply for benefits even though he had been told this information over a dozen times in two weeks.[81]

Dr. Vutpakdi also recounted numerous examples of the effects of Plaintiff's memory loss and cognitive impairments had on activities of daily living.[82] Dr. Vutpakdi recounted that Plaintiff was unable to remember to brush his teeth, do laundry and take care of other grooming tasks without prompting by his mother.[83] He relied on others to make his meals and manage his money.[84] Plaintiff told Dr. Vutpakdi that when he was hungry, he found a ride to one of several family members' homes and showed up unannounced for dinner.[85] While Plaintiff admitted being capable of preparing some basic meals, it did not occur to him to have the necessary ingredients onhand to prepare a meal on his own.[86] According to Dr.

---

[81] Id.

[82] Id. at p. 3.

[83] Id.

[84] Id.

[85] Id.

[86] Id.

Vutpakdi, this inability to initiate activities independently is very common with the type of severe frontal lobe damage experienced by Plaintiff.[87]   This finding is consistent with Dr. Pollock's finding that Plaintiff had severe deficits in executive functioning. Dr. Vutpakdi opined that:

> Plaintiff had "severely limited intellectual functioning, slowed speed of information processing, executive dysfunction, and a profound memory deficit following an extremely severe brain injury which occurred in May of 2005.   His brain injury has contributed to marked impairments in concentration, persistence, pace; limitations in his ability to perform some activities of daily living; and impaired social functioning.   These impairments have rendered him unable to sustain competitive employment since his injury in 2005.

Based on this letter, Plaintiff applied for, and was awarded, benefits.  Because this letter explained that Plaintiff's condition was unchanged from the time period considered by the ALJ, 2005-2007, and because the Social Security Administration determined that the letter was sufficient to find Plaintiff disabled, the court concludes that the ALJ's failure to obtain an additional medical explanation of Plaintiff's mental functioning during the relevant time period as it related to his ability to engage in competitive employment resulted in actual prejudice.   The case must be remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g).

Another ground also exists for remand.   In making his credibility determinations, the ALJ found it material that Plaintiff

---

[87]     Id.

had a history of alcoholism and that D. H. Darmadi, M.D., ("Dr. Darmadi") opined that his patient was unable to work based on cirrhosis of the liver, an opinion that conflicted with Plaintiff's testimony concerning his daily activities and lack of complaint concerning this purported basis for disability.[88]   However, a review of the administrative record reveals that Dr. Darmadi's patient was not Plaintiff, but was another individual.[89]   Therefore, Plaintiff's credibility was unjustifiably discounted on that basis.

Because of the legal errors committed by the ALJ, the court finds that his opinion is not supported by substantial evidence.

### IV.   Conclusion

Based on the foregoing, the court **GRANTS** Plaintiff's Motion for Summary Judgment and **REMANDS** this action to the Commissioner for reconsideration of Plaintiff's application for benefits in light of this opinion.   Defendant's motion for summary judgment is **DENIED**

**SIGNED** in Houston, Texas, this 9th day of September, 2008.

Nancy K. Johnson
United States Magistrate Judge

---

[88]     Tr. 21-22.

[89]     The records on pages 183-211 of the administrative record concern an individual with a history of heavy alcohol abuse.

22